CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG -4 2017

JULIA C. DUDLEY, CLERK
BY: /s/ M. Stiltner
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JULIAN BARKSDALE, | ) | Civil Action No. 7:16-cv-00355 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| HAROLD CLARKE, et al., | ) | By: Hon. Jackson L. Kiser |
| Defendants. | ) | Senior United States District Judge |

Julian Barksdale, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. § 1983, naming staff of the Virginia Department of Corrections ("VDOC") and Red Onion State Prison ("Red Onion") as defendants.[1] Plaintiff complains that his classification and incarceration in Red Onion at Security Level S between March 17, 2015, and November 27, 2016, violated a settlement agreement and the Eighth and Fourteenth Amendments of the United States Constitution. Defendants filed motions for summary judgment, and Plaintiff responded, making this matter ripe for disposition.[2] After reviewing the record, I dismiss the claim about a settlement agreement for lack of standing and grant Defendants' motions for summary judgment.

I.

Plaintiff arrived at Red Onion on April 5, 2011, while serving a total sentence of 78 years and 16 days for statutory burglary, four firearms convictions, two malicious wounding convictions, attempted first-degree murder, and second-degree murder. To date, Plaintiff has

---

[1] Plaintiff also named "Dual Treatment Team" as a defendant. Any claim against "Dual Treatment Team" must be dismissed for failing to state a claim upon which relief may be granted because "Dual Treatment Team," as a group of people, is not a proper "person" under § 1983. See, e.g., Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); Ferguson v. Morgan, No. 1:90cv06318, 1991 U.S. Dist. LEXIS 8295, 1991 WL 115759, at *1 (S.D.N.Y. June 20, 1991) (concluding that a group of personnel, like "medical staff," is not a "person" for purposes of § 1983).

[2] Plaintiff filed a "motion to file amended summary judgment," by which he provides brief opposing argument and attaches "Enclosure E." The motion is granted to the extent I consider the additional argument and the attached enclosure.

been found guilty of at least eighty-nine institutional convictions, including ten for threatening bodily harm, planning to commit aggravated assault upon a non-offender, and possession of a weapon or sharpened instrument.

Plaintiff has been in segregated housing during the majority of his confinement at Red Onion. Plaintiff complains that he was "arbitrarily" designated as a Level S inmate on March 17, 2015, and that he was designated as a Special Management inmate for approximately twenty months before he commenced this action.[3]

Red Onion's Level S inmates may be designated in one of two main categories: Intensive Management ("IM") or Special Management ("SM").[4] From the most to least restrictive security classifications, IM inmates are designated as IM-0, IM-1, IM-2, and IM-SL6, and SM inmates are designated as SM-0, SM-1, SM-2, and SM-SL6.[5] SM-SL6 inmates may be reduced to Level

---

[3] Level S is not a scored security level but is a special purpose bed assignment. Red Onion is the only VDOC facility that houses Level S inmates.

[4] IM inmates are those inmates:
> [W]ith the potential for extreme and/or deadly violence[.] [T]hey may have an institutional adjustment history indicating the capability for extreme/deadly violence against staff or other offenders. This group most often would have an extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavioral characteristic. The potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year or compliant, polite, and cooperative behavior and attitude. Alternatively, the offender may present a routinely disruptive and threatening patter of behavior and attitude. Also includes offenders incarcerated for a notorious crime that puts them at risk from other offenders.

SM inmates are those inmates:
> [W]ho may display an institutional adjustment history indicating repeated disruptive behavior at lower level facilities, a history of fighting with staff or offenders, and/or violent disruptive behavior at lower level facilities, a history of fighting with staff or offenders, and/or violent resistance towards a staff intervention resulting in harm to staff, other offenders without the intent to invoke serious harm or the intent to kill, or serious damage to the facility, and where reasonable interventions at the lower security level have not been successful in eliminating disruptive behaviors.

[5] Inmates in IM-0 or SM-0 choose not to participate in the Step-Down program or continue to exhibit inappropriate behavior. Consequently, they do not benefit from the Step-Down programming and instead receive the basic requirements afforded to inmates in VDOC special housing units.

2

6's Structured Living Phase 1 and then to Phase 2. Graduation from Phase 2 makes the inmate eligible to be assigned to Level 5 and housed in a general population unit.

When Level S inmates exhibit positive behaviors and successfully complete established goals, they are rewarded with more privileges via a reduction in their security classifications. All Level S inmates are given the opportunity to participate in the "Challenge Series," a goal-oriented, incentive-based segregation housing plan for inmates to study pro-social goals via seven workbooks. A multi-disciplinary group of staff who work in the housing unit called the Unit Management Team tracks and rates each Level S inmate's weekly performance for things like personal hygiene, respect, and standing for count as achievable progress toward the next lower security level. Counselors also rate each inmate's participation as incomplete, positive effort, or complete. Staff in both groups should communicate the ratings to inmates, acknowledge positive performance, and motivate inmates for improvement.[6] An IM or SM inmate who does not satisfy program criteria at any time can be denied a "step down" to a lower classification or returned to a higher classification level.

While he did advance through the Step-Down program and was housed in less restrictive Structured Living assignments during 2014, he was returned to SM-0 status after receiving institutional charges in September 2014 and in March 2015. Plaintiff complains that he has already completed the Challenge Series workbooks and yet been told to restart the workbooks and has remained classified as SM-0 since March 17, 2015. However, Plaintiff has violated institutional rules since being designated Level S, and inmates in the Step-Down program are

---

[6] In addition to the Unit Management Team's weekly progress ratings, the Institutional Classification Authority ("ICA") routinely reviews all segregation inmates approximately every ninety days. The ICA reviews and acts on recommendations for step increases or reductions, and all classification decisions may be appealed through the Offender Grievance Procedure.

expected to remain free of disciplinary infractions. Because the Challenge Series is a cognitive based program, inmates, like Plaintiff, who incur charges or are considered to still exhibit behavior problems are deemed to have not yet adopted the Challenge Series' improved thought patterns and social skills. Consequently, disruptive inmates may be removed from the Step-Down program or may be required to restart the Challenge Series.

Plaintiff was placed in pre-hearing administrative segregation at Red Onion after receiving an institutional charge in March 2015. On April 15, 2015, Plaintiff was released from administrative segregation and assigned to SM-0. Plaintiff was moved into disciplinary segregation between September 18 and October 18, 2015, because of another disciplinary conviction, and was then released back to SM-0. Plaintiff's classification was reduced to SM-1 at an undisclosed time, and on December 2, 2016, the ICA determined that SM-1 remained the appropriate housing level.

During the time relevant to this case, male Level S inmates were permitted numerous personal property: shoes; clothing; bedding; towels; a toothbrush; a calendar; a pen; an address book; approximately forty first-class stamps; reading material; reading glasses; a radio; an audio player; batteries; comb; hairbrush; shaving razor; watch; wedding band; eyeglasses; prescribed medical items; and religious items.[7] Level S inmates are restrained in handcuffs and shackles, are strip searched, and are escorted by several officers whenever they leave their cells.

IM and SM inmates are afforded similar privileges. All IM inmates had the following minimum privileges: two library books per week; religious and legal materials in the cell;

---

[7] Access to some personal property is prohibited when an inmate moves from Level 5 to Level S. For example, the Level S inmate may no longer possess a photo album, a belt, a toothbrush case, handkerchiefs, tennis shoes, a calculator, sunglasses, board games, playing cards, and a coffee mug. These items would be stored until the inmate is sent to a lower level facility.

4

commissary; educational and religious television programs displayed on a pod wall; a radio; an audio player; individual in-cell correctional programs; two hours of outside[8] recreation per week; two twenty-minute phone calls per month; three showers per week; and a non-contact visit for one hour per week.[9] Inmates in IM levels less restrictive than IM-0 receive greater content or frequency of the privileges like more library books per week and more access and variety of in-cell television programs. IM-2 and IM-SL6 inmates may have jobs, and notably, IM-2 and SM-2 inmates may receive correctional programming in groups of up to five inmates. Per policy, IM and SM inmates receive the same types of meals as served to the general population, but IM and SM inmates eat their meals alone in their cells.[10]

Plaintiff complains about the conditions of confinement as an SM inmate at Red Onion. He allegedly "has been subjected to (and/or will be subjected to in the future)": mental illness and nightmares; the "denial, restriction of good time credits"; "unavailability of activities, environment which is/or conclusive to pro-social interactions in furtherance of Plaintiff's rehabilitation, well being, etc."; "anxiety, headaches, loss of sleep and (to Plaintiff's belief) PTSD"; "physical deterioration/loss of weight, etc"; "deterioration of eye sight (due to constant exposure to extremely bright fluorescence lights in cells)"; one hour of recreation five times per week; showers three times a week; cavity searches whenever leaving the cell; virtually no person

---

[8] If weather does not allow for outside recreation, recreation occurs in the pod.

[9] SM inmates and inmates at Level 6 Structured Living Phases 1 and 2 are generally afforded the same "minimum" privileges as IM inmates, but SM inmates are granted more privileges quicker as they "step down" security levels. For example, SM inmates have earlier access to jobs and are permitted more visitation and more phone calls.

[10] An inmate's classification is reduced from Level S to Level 6 Structured Living when staff determines an SM-2 inmate has satisfactorily completed the Challenge Series curriculum and achieved the behavioral goals of SM-2. The purpose of Level 6 Structured Living is to reintroduce inmates into a social environment and to test their readiness for possible transfer to the general population at Level 5. Phase 1 inmates are single celled, are allowed to exit a cell and enter the pod individually, are unrestrained during showers and recreation, have individual and group therapy, enjoy outside recreation two hours per week, may listen to audio books, and walk as a group to the dining hall to eat group meals. Phase 2 inmates have the same privileges as Phase 1 but are housed with a cellmate.

to person contact; commissary privileges up to $40 per month; limited selection of commissary goods; wearing state-issued shoes with less padding than sneakers, which causes knee pain; no education or vocational opportunities besides adult basic education for a GED; and being compelled to shave his beard in violation of his religious beliefs.

Plaintiff complains that he was not given prior notice, the opportunity to participate in a hearing, or a written explanation for his assignment to SM. Plaintiff wrote defendant Unit Manager Duncan on March 31, 2016, to ask about his status level, and she, along with defendant Lt. C. Gilbert, replied that Plaintiff could not step down due to having a "poor rating." Plaintiff complains that he cannot see the weekly reports that allegedly document the reasons for his "poor rating" because he alleges that "he has never had any serious or major incidents (to Plaintiff's recollection)." Plaintiff further argues that he was never supposed to be put in a "phase program or similar program per the settlement agreement and court order per Brown v. Sieleff[,] CA #81-00853-R[,] [a]nd that's for all the DOC that Virginia Department of Corrections agreed to."

## II.

Defendants argue that they are entitled to qualified immunity and summary judgment. Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); In re Allen, 106 F.3d 582, 593 (4th Cir. 1997) ("[A]n official may claim qualified immunity as long as his actions are not clearly established to be beyond the boundaries of his discretionary authority."). Once a defendant raises the qualified

immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993).

A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); see Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (recognizing a party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant). "Material facts" are those facts necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Instead, a court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). A plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by the motion for summary judgment. Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009).

## III.

To the extent Plaintiff fails to identify individual defendant's personal acts or omissions, Defendants are entitled to qualified immunity and summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). Acknowledging this deficiency, Plaintiff argues, "In the event that any . . . defendant(s) did not directly violate any stated right(s), Plaintiff asserts . . . defendant(s) contributed to said violations via within their individual and official capacit[ie]s via deliberate indifference when they approved of and or upheld said violations via policy, complaints, grievances, etc. . . . ." However, Plaintiff cannot succeed on a basis of respondeat superior, and a "superior's after-the-fact denial of a grievance falls far short of establishing § 1983 liability."[11] DePaola v. Ray, No. 7:12cv00139, 2013 U.S. Dist. LEXIS 117182, at *23, 2013 WL 4451236, at *8 (W.D. Va. July 22, 2013) (Sargent, M.J.) (citing Brooks v. Beard, 167 F. App'x 923, 925 (3rd Cir. 2006)); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 n.7, 691-94 (1978). Furthermore, a claim that prison officials have not followed their own independent policies or procedures also does not state a constitutional claim. See, e.g., United States v. Caceres, 440 U.S. 741, 752-55 (1979); Riccio v. Cnty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990). Accordingly, Defendants are entitled to qualified immunity and summary judgment on these bases.

## IV.

Plaintiff's argues that confinement in Red Onion at Level S violated procedural due process guaranteed by the Fourteenth Amendment. I find that it did not and award the Defendants qualified immunity and summary judgment for this claim.

---

[11] Additionally, inmates do not have a constitutionally protected right to a grievance procedure. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994).

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted); but see Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997) (recognizing there logically could not be a claim that confinement to administrative segregation exceeds the sentence imposed in such an extreme way as to give rise to the protection of the Due Process Clause by its own force).

"The United States Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Wilkinson, 545 U.S. at 221-22; see Allgood v. Morris, 724 F.2d 1098, 1101 (4th Cir. 1984) ("[S]egregated confinement is not per se unconstitutional."). However, a state-created liberty interest may exist if the inmate points to "a basis for an interest or expectation in state regulations" to avoid the conditions of his confinement under the segregation classification scheme at Red Onion and also shows that those conditions impose atypical and significant hardship in relation to the ordinary incidents of prison life.[12] Sandin v. Conner, 515 U.S. 472, 484 (1995); Prieto, 780 F.3d at 250. Only if the inmate

---

[12] The normative baseline for a prisoner are the "conditions dictated by a prisoner's conviction and sentence . . . constituting the 'ordinary incidents of prison life.'" Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015). General population is the baseline in this case. See id.; cf. Prieto, 780 F.3d at 253 (concerning prisoners sentenced to death). Consequently, Plaintiff's description of conditions on death row are not material to this analysis.

satisfies both conditions does the Due Process Clause require a particular measure of procedural protection before a deprivation of a liberty interest. Id.

Nonetheless, the legitimacy of the VDOC's purpose in designing the Level S program is "beyond question . . . . [when] the regulations are expressly aimed at protecting prison security, a purpose . . . central to all other corrections goals." Thornburgh v. Abbott, 490 U.S. 401, 415 (1989) (internal quotation marks omitted). "The State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." Wilkinson, 545 U.S. at 227. "The difficulties of operating a detention center must not be underestimated by the courts[,]" and "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face" in maintaining prison security and safety. Florence v. Bd. of Chosen Freeholders, 566 U.S. 318, 326 (2012); see Wolff v. McDonnell, 418 U.S. 539, 556 (1974) ("[T]he fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed."); see also Graham v. Connor, 490 U.S. 386, 455 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." (internal quotation marks and citation omitted)).

Assuming, arguendo, that VDOC policy creates a liberty interest to avoid the conditions of Level S at Red Onion, I find that Plaintiff's confinement there, and the attendant conditions he experiences, do not constitute an "atypical and significant hardship" compared to the "ordinary incidents of prison life" he could expect. See Sandin, 515 U.S. at 484. The mere limitations on privileges, property, and activities for administratively segregated inmates "fall[] within the expected perimeters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485; see

Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991) (holding that changes in a prisoner's "location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently").

The duration and conditions of Plaintiff's confinement at Red Onion do not implicate the concerns discussed in Wilkinson v. Austin, 545 U.S. 209, 213 (2005), and Incumaa v. Stirling, 791 F.3d 517, 519 (4th Cir. 2015). In Wilkinson, the Supreme Court found that inmates had a protected liberty interest in avoiding assignment to a state "supermax" prison. Without undergoing a point-by-point comparison of the conditions between segregation and general population, the Supreme Court distinguished the supermax conditions from normal segregation for three primary reasons. First, inmates in the supermax prison were "deprived of almost any environmental or sensory stimuli and of almost all human contact."[13] Wilkinson, 545 U.S. at 214. Second, the inmates were assigned to the supermax prison for "an indefinite period of time, limited only by [the] inmate's sentence." Id. Third, inmates otherwise eligible for parole lost that eligibility while imprisoned at the supermax prison. Id. at 215. "[A]ny of these conditions standing alone might not be sufficient to create a liberty interest, [but] taken together[,] they impose[d] an atypical and significant hardship within the correctional context." Id. at 224. Similarly in Incumaa, the Fourth Circuit found a protected liberty interest in avoiding assignment

---

[13] The conditions at the supermax prison included, "[a]lmost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; [and] exercise is for 1 hour per day, but only in a small indoor room." Id. at 223-24. The Supreme Court noted that the lack of human contact was the most distinctive of these living conditions. Id. at 224.

to South Carolina's supermax based on the prisoner's twenty-year confinement there and its isolating and restrictive living conditions, including a highly intrusive strip search every time he left his cell for twenty years. 791 F.3d at 531-32.

Taken together, the concerns espoused in Wilkinson and Incumaa focus on the indefinite nature of supermax confinement. In Wilkinson, prison policies provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there." 545 U.S. at 215. Also, policy required infrequent review of the continued appropriateness of an inmate's specific segregation status: once initially, thirty days after his arrival, and annually thereafter. Id. at 217. The policy in Incumaa required an institutional classification committee to evaluate the inmate's status every thirty days. 791 F.3d at 522-23. South Carolina policy provided that the inmate could qualify for reclassification and release from the supermax by achieving an "improvement in behavior level." Id. South Carolina policy further defined "behavior level" as including a clear disciplinary record and the staff's evaluation of the inmate's overall compliance. Id. at 522. Notably, the inmate in Incumaa had never incurred a disciplinary infraction in twenty years, yet staff kept the inmate in supermax conditions for twenty years without any behavioral basis for doing so. Id. at 521-23.

Undoubtedly, Level S inmates experience more restrictive conditions than Level 5 inmates in general population, but that fact does not render such confinement atypical or significantly harsh. General population inmates can also expect cell and strip searches, temporary housing in segregation under similar restrictions, and limited access to property and the public. See Sandin, 515 U.S. at 486 (discussing similar conditions for thirty days); Beverati, 120 F.3d at 504 (same for six months). Nonetheless, policy permitted Plaintiff to have personal

property that not only constituted life's basic necessities, but also allowed books, an audio player, religious items, and multiple means to communicate with the public. Level S inmates are allowed jobs, visitation, group experiences, television programming, educational programming, and various commissary purchases.

Unlike Wilkinson, the record does not reflect that Level S inmates are deprived of environmental or sensory stimuli and all human contact.[14] While it is not as easy to communicate with other inmates when confined in Level S, Plaintiff fails to establish that conversation is not permitted from cell to cell. See Wilkinson, 545 U.S. 209 (noting conversation was not permitted from cell to cell as a factor for the Court's conclusion all human contact was prohibited). Furthermore, positive communication with staff is encouraged as inmates work through the Step-Down program to lower their security level. Also unlike Wilkinson where the supermax inmates were kept inside and reviewed once a year, Level S inmates are afforded environmental stimuli three times a week with outdoor recreation, are "informally" reviewed every thirty days, and are "formally" reviewed every ninety days.[15] Unlike Incumaa, Level S inmates are not solely dependent on the subjective perspectives of staff during a review. Instead, Level S inmates can objectively demonstrate pro-social progress by completing the Challenge Series workbooks, by complying with staff's commands, and not committing disciplinary infractions.[16] Also unlike the twenty-year restrictions experienced in Incumaa, Plaintiff has spent a drastically shorter period of time at the most restrictive level of Level S.

---

[14] Indeed, Plaintiff complains of too much stimuli caused by other inmates.
[15] "Informal" and "formal" refers generally to the extent an inmate has notice of the hearing and is involved in the review process.
[16] Nonetheless, completion of the Challenge Series is but one factor considered.

13

Plaintiff's various complaints about fewer amenities do not describe an atypical or significant hardship. The fact Level S inmates are "incentivized" to complete seven workbooks and examine their behaviors is neither an atypical nor significant hardship. See, e.g., McKune v. Lile, 536 U.S. 24, 36, 40 (2002) (noting "[t]he Court has instructed that rehabilitation is a legitimate penological interest that must be weighed against the exercise of an inmate's liberty" and concluding "the denial of discrete prison privileges for refusal to participate in a rehabilitation program [does not] amount[] to unconstitutional compulsion"); see also id. at 54 (Stevens, J., dissenting) ("No one could possibly disagree with the plurality's statement that offering inmates minimal incentives to participate [in a rehabilitation program] does not amount to compelled self-incrimination prohibited by the Fifth Amendment." (internal quotation marks omitted)). Moreover, the grooming policy about which Plaintiff says forced him to shave his beard in violation of his religious beliefs is the same grooming policy applicable to inmates in general population; consequently, it cannot be "atypical." See Beverati, 120 F.3d at 527-28 (noting conditions are not atypical if similarly experienced by the rest of the prison population). Also, Plaintiff does not establish that confinement at Red Onion made him ineligible for parole, which was the case for the inmate in at the supermax facility in Wilkinson.[17] Moreover, Plaintiff does not allege that earned good conduct time was taken away as a consequence of being designated as Level S.[18]

---

[17] Plaintiff does not establish that was ever eligible for parole for the crimes he committed. Attachments to the complaint show Plaintiff was classified as "ineligible" for parole, and court records from the Circuit Court of Roanoke City show that Plaintiff was incarcerated after pleading guilty in July 2009 to, inter alia, a murder committed in 2008. See In Re Katrina Canal Breaches Consol. Litig., 533 F. Supp. 2d 615, 631-33 & nn.14-15 (E.D. La. 2008) (collecting cases indicating that federal courts may take judicial notice of governmental websites, including court records). Parole was discontinued in Virginia long before Plaintiff committed his crimes in 2008. See VA. CODE § 53.1-165.1 (abolishing parole for individuals convicted of a felony committed after January 1, 1995).

[18] Despite Plaintiff's repeated assertion of being "punished by loss of good conduct time," the record does

In sum, the record does not establish that the conditions of Plaintiff's confinement at Level S in Red Onion imposed an atypical and significant hardship in relation to the ordinary incidents of prison life. The conditions at Level S are distinguishable from the isolating conditions and indefiniteness identified in Wilkinson and Incumaa, and Plaintiff fails to describe the violation of a federal right that was clearly-established before or during his confinement at Level S in Red Onion. Accordingly, Defendants are entitled to qualified immunity and summary judgment for this claim.

V.

Plaintiff also complains that the treatment of SM inmates is different than inmates in general population. The Equal Protection Clause generally requires the government to treat similarly situated people alike. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). Thus, to prove an equal protection claim, an inmate "must first demonstrate 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" Id. (quoting Morrison v. Garraghty,

---

not reflect that the assignment to Level S determined the length of his sentence. Instead, the record reflects that he did not earn good conduct time as a result of being Level S. Inmates do not have a protected liberty interest in earning a specific rate of good conduct time, and courts have held that the effect of a classification change on the ability to earn good-time credit is too speculative to constitute a deprivation of a protected liberty interest. See, e.g., Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979); Luken v. Scott, 71 F.3d 192, 193-94 (5th Cir. 1995) (citing Meachum v. Fano, 427 U.S. 215, 229 n.8 (1976)); DeBlasio v. Johnson, 128 F. Supp. 2d 315, 329-30 (E.D. Va. 2000), aff'd, 13 F. App'x 96 (4th Cir. 2001); see also Wolff, 418 U.S. at 557-58 (recognizing the Constitution does not guarantee good time credit for satisfactory behavior while in prison). Consequently, I cannot find that Plaintiff's time at Red Onion inevitably affected the length of his confinement so as to trigger a separate, constitutionally protected liberty interest in avoiding that classification. See, e.g., Sandin, 515 U.S. at 487.

239 F.3d 648, 654 (4th Cir. 2001)). He must next show that the policy is not "reasonably related to [any] legitimate penological interests." Veney, 293 F.3d at 732. This element requires the inmate to "allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." Id. Reliance on labels and conclusions is insufficient. See, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

The two groups – SM inmates and general population inmates – are not similarly situated; an inmate's security classification is based on his individual institutional disciplinary history. Moreover, the different treatment of these two groups under Step-Down program is rationally related to legitimate, self-evident penological goals. See, e.g., Overton v. Bazzetta, 539 U.S. 126, 133 (2003). Moreover, Plaintiff fails to establish intentional or purposeful discrimination. Considering these circumstances, Plaintiff's placement in Level S does not violate the Equal Protection Clause, and Defendants are entitled to qualified immunity and summary judgment for this claim.

## VI.

Plaintiff generally concludes that his conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment. To establish such a claim, an inmate must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities;" and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The inmate must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995).

Plaintiff's allegations do not show that he has suffered any Eighth Amendment violation due to his experiences in the Step-Down program. Plaintiff does not establish that he was deprived of any necessity for life like food, shelter, or medical care and, instead, complains generally about the restrictive conditions.

Plaintiff asserts that the conditions of SM status have caused him to suffer anxiety, headaches, and loss of sleep, and further to his speculative belief also post-traumatic stress disorder, physical deterioration, weight loss, and loss of eye sight due to bright lights. However, Plaintiff fails to state facts showing that any of his undocumented health concerns qualify as a serious or significant harm or that he ever required medical care. Furthermore, Plaintiff fails to establish how any specific "cruel and unusual" prison condition caused these alleged ailments, and he further fails to demonstrate he has suffered, or is likely to suffer, a sufficiently serious or significant injury as a result of "cruel and unusual" conditions of confinement. See, e.g., Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993) ("[I]n order to withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions."). Accordingly, Defendants are entitled to qualified immunity and summary judgment for this claim.

## VII.

Plaintiff argues that the VDOC should not have a "phase program or similar program per the settlement agreement and court order per Brown v. Sieleff[,] CA #81-00853-R. . . ." Plaintiff does not provide any evidence of a settlement agreement or court order, has not established an injury in fact, and thus, fails to establish standing to pursue this claim. See, e.g., Lujan v.

Defenders of Wildlife, 504 U.S. 555, 561 (1992); Stephens v. Cnty. of Albemarle, 524 F.3d 485, 490-91 (4th Cir. 2008). Accordingly, the claim is dismissed without prejudice for lack of subject matter jurisdiction. See, e.g., Cent. States Se. & Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, 433 F.3d 181, 198 (2d Cir. 2005).

## VIII.

For the foregoing reasons, I grant Plaintiff's "motion to file amended summary judgment," dismisses without prejudice the claim about a settlement order, dismisses all claims against defendant "Dual Treatment Team," and grants Defendants' motions for summary judgment.

ENTER: This 4th day of August, 2017.

Senior United States District Judge